IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| **JAMES CECIL HOLMES, JR.,** | ) | Case No. 11-03101-TOM-7 |
| | ) | |
| Debtor. | ) | |

| | | |
|---|---|---|
| **TAMIKA JONES,** | ) | |
| | ) | |
| Plaintiff, | ) | A.P. No. 11-00391-TOM |
| vs. | ) | |
| | ) | |
| **JAMES CECIL HOLMES, JR.,** | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This adversary proceeding came before the Court on April 9, 2012, for trial on the complaint filed by Tamika Jones. Appearing before the Court were plaintiff Tamika Jones ("Jones"); Charles H. Boohaker, counsel for Jones; Debtor, James Cecil Holmes, Jr. ("Holmes"); Lewis Christopher Godwin, counsel for Holmes; and Officer Terry Cole, witness for Jones. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 151, and 157(a) and the District Court's General Order Of Reference Dated July 16, 1984, As Amended July 17, 1984.[1] This is a core proceeding arising under

---

[1] The General Order of Reference Dated July 16, 1984, As Amended July 17, 1984 issued by the United States District Court for the Northern District of Alabama provides:

> The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

Title 11 of the United States Code as defined in 28 U.S.C. § 157(b)(2)(I).[2] This Court has considered the pleadings, arguments, evidence, testimony, and the law, and finds and concludes as follows.[3]

## FINDINGS OF FACT[4]

On October 9, 2009, Jones visited Ken's Auto Salvage ("Ken's Auto"), a junkyard owned by Holmes, in order to purchase brakes for her car. While Jones was inside the building speaking with Holmes three pit bull dogs came from the junkyard through a back door of the building and into a hallway which led into the customer area of the shop, knocking her down and attacking her. Jones sustained bites on her legs, face, and the top of her head. She was taken to the emergency room at UAB, where it took at least six hours for all of her wounds to be closed with stitches and staples. After being released from a three-day hospital stay Jones required further medical treatment including treatment by a specialist at the Kirklin Clinic for nerve damage on the right side of her face, and care from a home health care provider for six months.

Jones and Holmes agree on some of the details of the incident. The dogs gained entry to the customer service area through an open door with no gates or other barriers to keep them outside, and Jones did nothing to provoke the dog attack. The two disagree as to Holmes's actions during the

---

[2] 28 U.S.C. §157(b)(2)(I) provides as follows:

(b)(2)Core proceedings include, but are not limited to–
(I) determinations as to the dischargeability of particular debts[.]

[3] This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

[4] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court may take judicial notice of the contents of its own files. *See ITT Rayonier, Inc. v. U.S.*, 651 F.2d 343 (5th Cir. Unit B July 1981); *Florida v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975).

attack. According to Jones, she did not see who got the dogs off of her but it was not Holmes. She somehow ended up outside the building but has no idea how she got there. On cross-examination she admitted she has gaps in her memory. Holmes contends that when he saw the dogs attack Jones he went around the counter, got the dogs off of her, took her outside, and put ice on her wounds. Someone called 911 to report the attack and an ambulance arrived to take Jones to the hospital.

Officer Terry Cole of the Lipscomb Police Department testified that he answered the 911 call and arrived at Ken's Auto to find a woman bleeding from her face and legs, and several people standing outside the building. He did not see the dogs outside. After securing medical help for Jones he spoke with Holmes who, according to Officer Cole's testimony, admitted the dogs involved in the attack were his. During his investigation of the scene he saw the hallway where the dogs came in but did not see a gate or barrier that would have prevented the dogs from coming into the building. Officer Cole further testified that about one month prior to the attack on Jones he was called to Ken's Auto to investigate another dog bite incident. During his investigation of that incident Officer Cole determined that the victim was likewise in the customer area of Ken's Auto at the time of the attack and that the dogs had entered the area in the same way. There was no gate or other barrier to keep the dogs away from the customer area at that time either. As in the incident involving Jones, Holmes admitted that he owned the dogs involved. Officer Cole gave Holmes a citation and informed him the dogs should not be there during business hours. Officer Holmes testified that he had not been called to Ken's Auto at any other time.

Holmes admitted that the attack involving Jones was at least the third attack on the Ken's Auto premises involving the same dogs. One was the attack about which Officer Cole gave testimony, and another took place in the yard. A civil suit was brought against Holmes by one of the

3

victims of the prior attacks. That suit eventually settled with Holmes agreeing to pay damages to the victim. After the incident involving Jones, Holmes pled guilty in the city of Lipscomb for violating their leash laws, and in state court pled guilty for failure to quarantine the dogs.

Officer Cole testified that Holmes admitted on two separate occasions that the dogs involved in the attacks were his. Holmes's own testimony as to his ownership of the dogs is somewhat inconsistent. He testified first that he owned one of the dogs, then that he owned two. He further testified that he had a problem with strays around the junkyard and that the dog responsible for the most injury to Jones was a stray female in heat. After the attack on Jones he called Jefferson County Animal Control to pick up the dog in heat but the dog was not picked up until a couple of days later. The stray dogs continued to come around after the attack, staying for a few hours to a week at a time, but they finally stopped coming around a few months later. Holmes lived at the junkyard so his own dog was always there.

According to Holmes the dogs never tried to bite him so he was not afraid of them. He thought it was fine to leave the back and front doors open even though the dogs had previously attacked two people. Holmes testified that he did not intend for the dogs to attack or injure either Jones or anyone else, but admitted that the attack on Jones could have been prevented had he kept the door closed.

Jones still experiences lingering effects from the attack. She continues to suffer from the nerve damage to her face and the right side of her face droops when she smiles. She occasionally has pain and swelling in her legs. Jones has been diagnosed with post traumatic stress disorder, and although she has received psychiatric help, she has not completely recovered psychologically. She remains fearful of large dogs and is frightened at the sound of dogs barking.

## CONCLUSIONS OF LAW

Jones alleges that Holmes willfully and maliciously injured her by allowing pit bull dogs to attack her while she was at his business. She has asked this Court to determine the debt owed to her by Debtor is nondischargeable pursuant to section 523(a)(6), which provides:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt –
> . . .
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

According to the Eleventh Circuit:

> Section 523(a)(6) of the Bankruptcy Code excepts from discharge in bankruptcy "any debt ... for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). We have interpreted "willful" to require "a showing of an intentional or deliberate act, which is not done merely in reckless disregard of the rights of another." *Lee v. Ikner (In re Ikner)*, 883 F.2d 986, 991 (11th Cir.1989); *Chrysler Credit Corp. v. Rebhan*, 842 F.2d 1257, 1263 (11th Cir.1988). As used in section 523(a)(6), "malicious" means "'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will.'" *In re Ikner*, 883 F.2d at 991 (*quoting Sunco Sales, Inc. v. Latch (In re Latch)*, 820 F.2d 1163, 1166 n.4 (11th Cir.1987)). Malice may be implied or constructive. *Id*. ("Constructive or implied malice can be found if the nature of the act itself implies a sufficient degree of malice."). In other words, "a showing of specific intent to harm another is not necessary." *Id*.

*Hope v. Walker (In re Walker)*, 48 F.3d 1161, 1163 - 64 (11th Cir. 1995) (footnote omitted). To have a debt declared nondischargeable pursuant to section 526(a)(6) a creditor must prove the injury was both willful and malicious. *Anglin v. Wallis (In re Wallis)*, AP No. 10-00010, 2011 WL 2357365, at *9 - *10 (Bankr. N.D. Ala. Mar. 31, 2011) (*citing Vickers v. Home Indemnity Co. (In re Vickers)*, 546 F.2d 1149, 1150 (5th Cir. 1977)).

Like many other circuits, the Eleventh Circuit Court of Appeals has adopted the approach that for an injury to be "willful" for purposes of section 523(a)(6) the actor must have intended the

5

actual injury, not just have intended the act that causes the injury. *Walker*, 48 F.3d at 1164. In *Hope v. Walker (In re Walker)*, the plaintiff, a subcontractor, was performing work for the debtor when he fell from a height of eight feet. The workers' compensation board awarded the plaintiff temporary and permanent partial disability benefits, medical costs, and other expenses, but he only received a portion of the award before the debtor filed his bankruptcy petition. The plaintiff filed an adversary proceeding, arguing that the debt should be nondischargeable since the debtor had not complied with a state law requiring general contractors to have workers' compensation insurance for subcontractors. The bankruptcy court held that the debtor's failure to obtain insurance was not a willful and malicious injury; thus, the debt was dischargeable. On appeal the district court affirmed the bankruptcy court's decision which was in turn affirmed by the Eleventh Circuit Court of Appeals. Looking at the plain language of section 523(a)(6) and the legislative history, the Eleventh Circuit remarked:

> Congress has been very clear in expressing its intention in section 523(a)(6). The plain language of section 523(a)(6) excepts from discharge debts arising from "willful and malicious injury" rather than "willful and malicious acts which cause an injury." . . . In reenacting this language in the Bankruptcy Reform Act of 1978, both houses of Congress stated that "[u]nder this paragraph 'willful' means deliberate or intentional. To the extent that *Tinker v. Colwell*, 193 U.S. 473[, 485, 24 S.Ct. 505, 508, 48 L.Ed. 754 (1904) ] held that a less strict standard is intended, and to the extent that other cases have relied on Tinker to apply a 'reckless disregard' standard, they are overruled."

*Walker*, 48 F.3d at 1164 (citations omitted). Recognizing its obligation to strictly construe exceptions to discharge to give a fresh start, the court held "section 523(a)(6) requires a deliberate or intentional injury." *Id*. at 1164 - 65. The court also recognized that "intent" can be found not only where the actor wants to cause the consequences of his act but also where the actor believes that consequences are substantially certain to follow the act. *Id*. at 1165 (*citing Restatement (Second)*

6

*of Torts § 8A* (1979)). Thus the Eleventh Circuit concluded "that a debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." *Id*. at 1165. The debt was deemed dischargeable since the injury was not substantially certain to result from the debtor's failure to obtain the requisite workers' compensation insurance.

There are few reported cases decided by Eleventh Circuit courts specifically addressing whether a debt for injuries caused by a dog attack is nondischargeable. This Court's research has uncovered two cases; one, *Gornall v. Sadwin (In re Sadwin)*, 3 B.R. 581 (Bankr. M.D. Fla. 1980), *aff'd* 15 B.R. 884 (M.D. Fla. 1981), held that such debt is dischargeable, while the other, *Rines v. Harris (In re Rines)*, 18 B.R. 666 (Bankr. M.D. Ga. 1982), held that the debt is not.

*Gornall v. Sadwin (In re Sadwin)* was decided under section 17(a)(8) of the Bankruptcy Act. In *Sadwin*, the debtors took their German shepherd to a veterinarian after the dog developed a rash. The first office visit was concluded without incident but on the second visit the dog bit the veterinarian on the lip. The vet obtained a default judgment, the debtors filed their bankruptcy case, and the vet brought an adversary proceeding to have the debt declared nondischargeable. In support of his position the vet cited to cases in which debts from similar incidents were held to be nondischargeable, but the court distinguished those cases from the one before it as having been decided by state courts prior to the Bankruptcy Act's grant to the bankruptcy courts exclusive jurisdiction to determine dischargeability under section 17(a)(8). The court distinguished the facts of the prior cases, noting that in the state court cases the dog owners had knowledge of the vicious nature of their dogs but the debtors in the case before that court had no such knowledge. *Id.* at 583.

In the second case from an Eleventh Circuit court, *Rines v. Harris (In re Rines)*, the debtors'

7

dog, who had previously attacked someone else, attacked the plaintiff. *Rines*, 18 B.R. at 667. In holding that the debt was nondischargeable the court looked to state law imposing strict liability on a dog's owner for injuries caused by the dog when the owner had knowledge of "the dog's propensity for biting." *Id*. at 669. The court acknowledged the enactment of the Bankruptcy Code and section 523(a)(6), wherein the legislative history explicitly stated that the reckless disregard standard no longer applied; however, the court opined that Congress did not mean to overrule, and could not overrule in a committee report, the existing law interpreting the meaning of willful and malicious. *Id*. at 669 - 70. However, since the time *Rines* was decided, the Eleventh Circuit has made clear in *Walker* that the "reckless disregard" standard may no longer be considered.

It does not appear that since *Sadwin* and *Rines* any court in the Eleventh Circuit has specifically addressed whether a debt for injuries caused by a debtor's dog is nondischargeable pursuant to section 523(a)(6). In fact, there are not many reported cases in all of the federal circuits combined that address this exact issue, but the ones that have done so have by and large concluded that the debt is dischargeable.

In one case decided soon after Congress enacted section 523(a)(6) the court determined that the keeping of a known dangerous dog did not equate to intent to cause injury, and thus was not willful under the statute. In *Ezzo v. Cecko (In re Cecko)*, 27 B.R. 26 (Bankr. N.D. Ohio 1982), the debtor's dog with "known vicious propensities" attacked a child at the child's home, causing extensive facial injuries and permanent disfigurement. When the debtor filed his bankruptcy petition the child's parent sought to have the debt excepted from discharge. While the plaintiff argued that "the keeping or harboring of a clearly vicious animal" sufficed to prove an intentional injury under section 523(a)(6), the defendant claimed that he acted negligently, or at most, with reckless

8

disregard. *Id*. at 26 - 27. In reaching its conclusion that the debt was dischargeable the court reviewed not only the legislative history of section 523(a)(6) but also a number of cases interpreting that section, noting that a majority of the cases excepting the debt from discharge involved intentional torts:

> While an owner may have to answer for the consequences of the conduct of a pet based upon the fundamental tort concepts of foreseeability and/or strict liability, it does not necessarily follow that a debt arising from such a claim is nondischargeable under present law. The vast majority of decisions which have found an exception to discharge under Section 523(a)(6) have involved intentional torts (such as assault and battery), and it is well-recognized that a deliberate or intentional act is required under that section.

*Id*. at 27 (citations omitted). Due to the debtor's "total absence of intent to injure" the debt was not excepted from discharge. *Id*.

In *Stewart v. Gargac (In re Gargac)*, 93 B.R. 549 (Bankr. M.D. Ohio 1988), the debtors' German shepherd attacked a four-year-old child. The attack occurred after the child entered onto the debtors' property while the dog was on the debtors' porch. The dog had never bitten anyone prior to attacking the child, but it had previously barked and growled at the child's father, prompting him to ask the debtors to keep the dog chained when the debtor-husband was not at home. In analyzing dischargeability under section 523(a)(6), the *Gargac* court cited a case in which the Sixth Circuit Court of Appeals concluded "willful" is "the deliberate and intentional doing of an act that necessarily leads to injury." *Gargac*, 93 B.R. at 551 (*citing Perkins v. Scharffe*, 817 F.2d 392, 394 (6th Cir.1987)). The *Gargac* court recognized that on hindsight an act may appear to have necessarily led to injury, but did not seem to necessarily lead to injury at the time the act occurred:

> In order to hold that the Debtors' actions were "willful" under § 523(a)(6), the Court must conclude that leaving the dog unchained, while Mr. Gargac was home, necessarily led to the dog's attack. While this definition provides some guidance, the

9

> standard is somewhat amorphous. When viewed with the benefits of hindsight, causation is easily seen, and "necessity" may be attributed to actions which were not clearly injurious when they were done. Thus, it appears that Congress intended the Court to view the Debtors conduct as it appeared at the time the allegedly "willful and malicious" action took place.

*Gargac*, 93 B.R at 551. Looking at the debtors' acts and the circumstances at the time of the incident, the court concluded it was not "virtually certain" that the injury would occur. Testimony established that the child's parents did not consider the dog an imminent threat as long as the debtor-husband was home, and there were no previous attacks that should have warned the debtors of the dog's potential to be dangerous. Based on these considerations the court concluded that the debtors did not act willfully and the debt was dischargeable. *Id.*

The *Gargac* court appears to have reached its holding at least in part because there were no warning signs that the dog was dangerous. The court did not address how it might have ruled had the dog previously bitten someone else. However, the Fifth Circuit Court of Appeals has determined that a debt was dischargeable even when the debtors knew their dog had been involved in a prior attack. In *Kelt v. Quezada (In re Quizada)*, 718 F.2d 121 (5th Cir. 1983), the debtors' pit bulldog attacked the plaintiff's four-year-old son. The dog, who had previously bitten another child, had escaped from the debtors' fence when the wife opened the gate to let someone in. In affirming the decision of the district court in favor of the debtors, which in turn affirmed the bankruptcy court, the Fifth Circuit Court of Appeals looked to the legislative history of section 523(a)(6) and determined that neither keeping the dog within a fence in a crowded neighborhood nor allowing the dog to escape could be considered intentional and deliberate infliction of injury. The court acknowledged that keeping a vicious dog in a crowded neighborhood could be considered reckless disregard of the potential injury to others and that allowing the dog to escape was negligent, but there was no "willful

10

and malicious injury" under section 523(a)(6). *Quezada*, 718 F.2d at 122.

One recent case from the Ninth Circuit Bankruptcy Appellate Panel upheld the bankruptcy court's determination that a debt resulting from a dog attack could not be discharged under section 523(a)(6). *Zauper v. Lababit (In re Lababit)*, AP No. 07-01227, 2009 WL 7751426 (B.A.P. 9th Cir. Oct. 8, 2009). In *Zauper v. Lababit (In re Lababit)*, the debtors' dog went onto the plaintiff's property and killed his cat. Prior to this, the dog had killed another neighbor's cat and was declared by the city animal control to be a "Potentially Dangerous Animal," or "PDA," a designation that required the debtors to post warning notices on their property and keep the dog muzzled, leashed, or locked in a kennel at all times. Apparently the debtors failed to comply. At the trial of the adversary proceeding two witnesses, both trained in investigating dogfighting, testified they had each witnessed the dog exhibiting aggressive behavior, had seen dogfighting apparatuses on the debtors' property, and had found scars and other marks on the dog indicating he was being used in dogfighting. Further, one witness had seen the dog running loose on numerous occasions both before and after the dog was declared a PDA. In determining that the debt owed to plaintiff was nondischargeable under section 523(a)(6), the *Lababit* bankruptcy court, like the *Cecko*, *Gargac*, and *Quezada* courts, held that the debtors must have intended the consequences of their act and not just the act itself. Unlike the other courts, the *Lababit* court took the view that the debtors' conduct was willful under section 523(a)(6). According to the Ninth Circuit B.A.P:

> We are not convinced on this record that the bankruptcy court clearly erred in its findings. It carefully considered all of the evidence before it and determined that the Lababits' conduct of knowingly owning a dog declared a PDA, a dog they trained to fight with a propensity for aggression and which had killed at least one other cat, combined with their intentional and repeated breach of their duties to confine, muzzle, or leash [the dog], or post warning signs, constituted a willful act or willful omission. To show their conduct was willful, [the plaintiff] need not prove that the

11

Case 11-03101-TOM7    Doc 25    Filed 06/21/12    Entered 06/21/12 15:03:44    Desc Main
Document    Page 11 of 15

> Lababits intended to inflict injury on [plaintiff's cat]; it was sufficient that they knew, based on [the dog's] history, that injury to [plaintiff's cat] was substantially certain to result if they failed to perform their duties.

*Id.* at *5.

In this case, in order to find that Holmes willfully caused injury to Jones within the meaning of section 523(a)(6), this Court must find that Holmes left the back door open with the intent that Jones be attacked and injured by the dogs. Although Holmes acted with the intent to leave the back door open, it is his intent to cause the injury that matters, and such intent may be shown by establishing Holmes either consciously desired the attack and the injury or that the attack and injury were substantially certain to result. Holmes testified that he did not leave the door open with the intent for Jones or anyone else to be injured by the dogs and there is no other evidence before the Court indicating otherwise. Thus, the important question here is whether the injury was substantially certain to occur when Holmes left the back door open.

The facts of the case before this Court are not significantly different from those in *Cecko*, *Gargac*, and *Quezada*. In those cases, as well as in this one, the debtors had no conscious intent that the plaintiffs be injured by the debtors' dogs. The debtors in *Quezada* and *Cecko*, like Holmes, had at least some kind of prior warning that their dogs were capable of attack. Regardless, the courts held that the resulting debts were dischargeable under section 523(a)(6) because the debtors' actions, i.e., leaving the dog unchained or allowing the dog to escape, were not acts substantially certain to result in injury. In contrast, the *Lababit* court affirmed the bankruptcy court's conclusion that injury was substantially certain to result from the debtors' "repeated intentional failure to comply with their duties" with regard to the dog. Testimony had established that the dog ran loose on multiple occasions, and further, that the dog was aggressive and likely being trained for fighting. Unlike the

12

debtors in *Lababit*, there is no evidence that Holmes did anything to encourage or train the dogs to act aggressively.

With hindsight it is easy to conclude that the attack on Jones occurred at least in part because Holmes left the back door open. Looking at the circumstances at the time of the incident, it is equally easy to see that leaving the back door open was not substantially certain to result in Jones's injury. Holmes personally was not afraid of the dogs. Regardless of whether the dogs all "belonged" to him or not he apparently had no concern that the dogs would attack, and thus had no concern about leaving the door to the junkyard open. The dogs had on at least one occasion run through the open door and attacked someone else, thus Holmes should have been aware the dogs could possibly do the same again.[5] However, "possibly" and "substantially certain" are not the same. It is safe to conclude that other customers had come into Ken's Auto between the first attack on someone and the attack on Jones. Holmes testified that he often left the door open so it is safe to conclude that the door had been left open when at least some of those other customers were in the building. There is no evidence that the dogs attacked every customer who came in while the door was open, or even many customers who came in at such times. This Court does not intend to imply that the number of attacks would have made a difference but one or two prior attacks does not equate to substantial certainty that the dogs would attack any time the door was left open. It could be said that Holmes acted with reckless disregard, or at least negligence, in leaving the back door open after the first attack but the Eleventh Circuit has made clear that reckless disregard is not enough to satisfy the willful requirement of section 523(a)(6).

---

[5] Testimony and exhibits offered at trial established that the dogs had attacked one person outside of the Ken's Auto building, but there is no evidence before the Court that the door was a factor in that incident.

13

Essentially, Jones is asking this Court to find that Holmes's failure to act is willful and malicious. Her position suggests that he failed to keep her safe by his failure to either keep the door shut or to provide or install a barrier to keep any dogs out of where she was standing. While there may be facts or circumstances that show willful and malicious conduct as a result of a failure to act, this Court cannot make that finding in this case. Considering the reported decisions addressed herein and the Eleventh Circuit's holding in *Walker*, this Court concludes that Holmes did not cause a willful injury for purposes of section 523(a)(6) because he had no intent to injure, maim, or otherwise hurt Jones. Without a willful injury the debt cannot be excepted from discharge under section 523(a)(6); thus it is not necessary for the Court to address whether the injury was "malicious" pursuant to section 523(a)(6).

This Court is sympathetic that Jones has suffered such a traumatic attack and continues to deal with the physical and psychological aftermath. From Jones's standpoint of what is fair, it would appear that Holmes should be responsible for paying for damages that he could have prevented. However, the purpose of bankruptcy is to give debtors a "fresh start," or in other words, to allow a debtor to discharge debts he cannot afford to pay and to start over. In enacting the Bankruptcy Code, Congress (not the Bankruptcy Court) determined what may and may not be excepted from discharge; this Court must apply the facts of a case to the laws enacted by Congress and may declare a debt nondischargeable only when allowed to do so by the statute. Despite its sympathy for Jones's position, this Court must hold that the debt is not excepted from discharge under section 523(a)(6).

## CONCLUSION

This Court finds that Jones has failed to prove that the debt owed to her should be declared nondischargeable under section 523(a)(6). Accordingly, it is hereby

**ORDERED, ADJUDGED, AND DECREED** that the relief sought by the Plaintiff, Tamika Jones, to declare certain indebtedness of the Debtor, James Cecil Holmes, Jr., nondischargeable in accordance with 11 U.S.C. § 523(a)(6) is **DENIED**. It is further

**ORDERED, ADJUDGED, AND DECREED** that the indebtedness of the Debtor, James Cecil Holmes, Jr., to the Plaintiff, Tamika Jones, is **DISCHARGEABLE** and shall be included in the discharge of the Debtor to be entered in this case by order of this Court. A separate Judgment, consistent with this Memorandum Opinion, and pursuant to Rule 9021 of the Federal Rules of Bankruptcy Procedure, will be entered.

Dated: June 21, 2012

/s/ Tamara O. Mitchell
TAMARA O. MITCHELL
United States Bankruptcy Judge

TOM/dgm

xc: Lewis Christopher Godwin, counsel for Debtor
Charles H. Boohaker, counsel for Tamika Jones
Andre M. Toffel, Chapter 7 Trustee

15